1

2

3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

4

5

6

| | |
|---|---|
| **DANELL PRATT,** | Case No.  13-cv-01225-YGR |
| Petitioner, | |
| v. | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| **B. GOWER, WARDEN,** | |
| Respondent. | |

7

8

9

10

11

12     Now before the Court is Danell Pratt's Petition for Writ of Habeas Corpus pursuant to 28

13   U.S.C. § 2254.  (Dkt. No. 15.)  Respondent has filed an answer and a memorandum of points and

14   authorities opposing the petition.  (Dkt. No. 24.)  Petitioner has filed a Traverse and supporting

15   exhibits.  (Dkt. Nos. 31, 33-34, 36.)  Thereafter, the Court ordered supplemental briefing on the

16   applicable standard of review (Dkt. Nos. 37-39) and held a hearing on the Petition on June 16,

17   2015.  For the reasons set forth below, the petition is **DENIED**.  (Dkt. No. 1.)

18   **I.     FACTUAL BACKGROUND**

19     In an unpublished opinion addressing the Petitioner's claims on direct appeal from the trial

20   court, the state Court of Appeal set forth the following summary of facts:[1]

21         A little after midnight on December 25, 2005, 17-year-old Alfredo
      Gutierrez and his 15-year-old brother, Aaron, were talking in the
22       living room of their home on Laurel Avenue.[2]  They had been
      carrying Christmas presents to their house from their grandfather's
23       house next door, and the door was still slightly open.  As Aaron was
      sitting on the couch against the wall and Alfredo was standing near
24       the television, the door swung open and someone came in and

25

26         [1] Footnotes included below within the quoted statement of facts come from the original,
   renumbered herein.

27

28         [2] As many of the individuals discussed in this opinion are relatives who share surnames,
   first names will be used for convenience in reading.  No disrespect is intended.

United States District Court
Northern District of California

pointed a gun at Aaron's head.  The person pulled the trigger but the gun did not shoot; he backed up a little bit and Alfredo tried to move in front of Aaron.  As he moved, the gunman shot him multiple times in the chest, abdomen, ribs and arms, then shot Aaron multiple times in both legs and in his scrotum.  Aaron spent about a month in the hospital and Alfredo about six weeks.  Both Alfredo and Aaron recognized the shooter at the time and identified him at trial as appellant.

Appellant and his identical twin brother, Lanell, lived with their grandmother a couple of houses away from the Gutierrez family; Alfredo and Aaron had known them their whole lives and used to spend time at their house playing with their younger cousin.  Alfredo testified that he could tell the twins apart by their facial expressions and their eyes: appellant looked "more aggressive" and "'meaner,'" and Lanell looked "a lot more mellow."  Aaron testified that he had always been able to tell the twins apart.  Alfredo and Aaron's mother, Carmen Gonzalez, testified that she could tell the difference between the twins once she started to know them, explaining that "you note face expressions" or "hear them talk."  She testified that her family referred to the "good twin" and the "bad twin"; appellant was the "bad" one because he did not respond to neighborly greetings.

Both Alfredo and Aaron testified that immediately after the shooting, they told their mother and the police that the shooter was "Twin."  Their mother, Carmen Gonzalez, testified that just after the shooting Aaron referred to the shooter as "Twin" and Alfredo referred to him as "Drew."  Alfredo testified that "Twin" was "Drew," pointing to appellant.  At some point during the investigation, Aaron told the police that they called the shooter "Twin" but when the twins were together they called him "Drew."  Alfredo testified that appellant was known as "Drew," and Lanell as "Twin," when the twins were together, but when they were not together, both were called "Twin."  Aaron knew both twins as "Twin" and also knew appellant as "Drew."

Carmen's brother, Andres (Andy) Gonzalez, also testified that just after the shooting Alfredo told him "Twin" had done it.  Although Andy knew both appellant and his brother as "Twin," he immediately thought of appellant because he had spoken with appellant when he ran into him outside the house at about 10:00 or 10:30 p.m. on December 24, 2005.  He had not seen appellant in a few years and was surprised to see him.  Andy had had far more contact with appellant than with Lanell over the years, but he had "no problem" telling them apart and was "100 percent certain" it was appellant he saw that night.  He told the police Alfredo had said "Twin" shot him.

La Trisha Payne, whose cousin was married to appellant, testified that both appellant and his brother were called "Twin" and, if they were together, "Twin One" and "Twin Two."  Janet Lee, who knew appellant through his wife, knew him as "Danell" and "Twin."  Janelle Carter, who knew appellant through his wife, wrote a letter to court on his behalf in a different case in which she referred to appellant as "Twin."

2

United States District Court
Northern District of California

Alfredo told the police that the shooter, Twin, had longer hair than his brother.  Aaron told the police that the shooter had a "fade" haircut, meaning "short, but you can still tell that he has hair," "maybe a little shorter" than appellant's hair at trial.

Aaron testified at the preliminary hearing that the shooter was wearing a black "hoodie" sweatshirt.  Both he and Alfredo testified at trial that the shooter did not have a hoodie pulled up over his head and scrunched tightly around his face; both were able to clearly see his face and hair.  Detective Jerry Alcaraz, who investigated the case, testified that neither of the victims, nor anyone else, ever told him the shooter was wearing a black hoodie over his head and scrunched tight around his face.

Carmen testified that between 11:00 and 11:15 p.m. on December 24, 2005, she noticed someone standing by her car, went out to check, and recognized appellant.  Aaron testified that about 20 or 30 minutes before the shooting, as he was walking out of his grandmother's house, he noticed appellant across the street.

After the shooting, Carmen ran outside screaming for help.  She saw someone crossing the street "at a fast pace" and going into the Pratt house.  She told the first police officer who arrived what she had seen and he said, "Lady, the kind of gun that he has, he would make a strainer out of me."

Detective Alcaraz responded to the scene about 50 minutes after midnight on December 25, 2005, after the victims had been transported to the hospital.  He was informed that one of the Pratt twins might be a suspect, "possibly the twin that was not bald."  Back at the station, Alcaraz found the most recent booking photographs of the twins, appellant's from January 2003 and Lanell's from May 2003.  He put Lanell's photograph in a lineup "because of information that I had received about the hair."  At about 2:00 a.m., Alcaraz showed this lineup to Andy Gonzalez, asking him to identify anyone he recognized, and Andy identified Lanell.  Andy testified that he circled the photograph he thought was of the person he had seen on the street that night, and that it was hard to tell the twins apart in photographs.

Alcaraz then went to the hospital and showed the photographs to Alfredo, who was unable to talk but pointed to one of them.  Alfredo testified that he thought this was the person who had shot him, although at trial he recognized it as a photograph of Lanell.  The photo array contained a photograph of only one of the twins.  Alfredo told Detective Alcaraz that he could not tell the difference between the twins in photographs.

At this point in the investigation, Alcaraz suspected that Lanell had committed the shooting.  Alcaraz had not shown anyone a photograph of appellant.  He contacted Lanell's parole officer and, at about 10:00 p.m. on December 25, received a message from County Communications to call Lanell Pratt at (408) 903-8972.  When he called this number, a person who identified himself as Lanell Pratt asked if Danell Pratt had been shot.  This led Alcaraz to

1

believe he should include Danell in his investigation.

2

Over the next days, Alcaraz attempted to reach both Pratt brothers. On December 28, he received a call from appellant's wife and asked her to have appellant call him. He did not hear anything from appellant. On January 3, 2006, Alcaraz met Lanell at his parole officer's office. He later spoke with Lanell's wife, mother-in-law and father-in-law, to confirm what Lanell told him. He also made an additional photo lineup containing appellant's booking photograph.

3

4

5

6

On March 10, 2006, Alcaraz showed the photo array containing Lanell's photograph and another six-photo array containing Danell's photograph to Aaron and asked him to point to anyone he recognized. Aaron picked the twins from their respective arrays, but was not able to say which of the twins had shot him, explaining that he could not distinguish them in photographs and would have to see them in person. Alcaraz then showed Alfredo the array containing appellant's photograph. Alfredo recognized appellant, but could not tell from the photographs which of the twins was the shooter and, like Aaron, thought it might help to see them in person.

7

8

9

10

11

12

Appellant was arrested on July 11, 2006. On October 11, Alfredo and Aaron each viewed a color photo line-up with both Pratt brothers in one six-photo array. Both boys recognized both of the twins, but were unable to distinguish which was the shooter; both were sure they would be able to tell the twins apart in a live line-up. A live line-up was conducted subsequently at which Alfredo, Aaron and Carmen each separately reported their identifications to the police. Alfredo and Aaron each identified number 3 as the shooter immediately upon being asked, and with 100 percent certainty. Carmen was asked who she recognized and indicated numbers 3 and 8.[3] She was "very positive" that appellant was the person she had seen by her car half an hour before the shooting.

13

14

15

16

17

18

At the preliminary hearing, Alfredo and Aaron each identified appellant as the shooter without hesitation. Alfredo testified that after the preliminary hearing, the police told him that the person he had first identified, Lanell, had an alibi in that he was with his family at the time of the shooting. Aaron was told by the district attorney that Lanell had an alibi but he did not remember when.

19

20

21

22

Neither Alfredo nor Aaron had any idea why the shooting occurred. Alfredo testified that he never had problems with the Pratt family while growing up. Aaron testified that on one occasion within months of the shooting, when he was at the Pratt house, "Twin" (appellant) told him he did not want him in his yard, saying "something about 'Your family is a snitch,' or 'You guys are snitching, I don't want you in my yard.'" Aaron testified that he had never in his life sold marijuana and this incident had nothing to do with marijuana.

23

24

25

26

27

28

---

[3] Carmen accidentally circled number 8 on her form but meant to circle number 9.

4

United States District Court
Northern District of California

Alfredo testified that there was drug dealing on his street. He had never sold or consumed drugs, seen anyone selling drugs in front of his house or coming to his house to buy drugs, or seen anyone in his family selling drugs. Nor had Alfredo ever seen Andy go to the Pratt house, observed any problems between Andy and the twins, discussed Andy with the twins, or told either of the twins to leave the neighborhood. Alfredo testified that he had never threatened appellant, owned a gun or walked around East Palo Alto exhibiting a gun, and that it would not be "smart" for someone of his age and race to carry a gun because that part of town was "run more by the blacks."

Aaron testified that he had never consumed drugs and, to his knowledge, no one in his house was doing drugs. He saw people selling drugs at the corner every day, but he had never seen anyone who lived at his or his grandfather's house selling drugs, seen anyone selling drugs in front of his house, seen anyone come to his house to buy drugs or seen anyone in his house doing drugs. He had never seen his uncles buying or selling drugs.

Carmen testified there was a lot of "traffic" and people hanging around in front of the Pratt house. She was not aware of any drug dealing at her house or her father's, and her family participated in an anti-drug program with the police department.

Andy acknowledged that he had had a drug problem, had one conviction for possession of drugs, and was currently participating in a drug treatment program. He had purchased cocaine from appellant "a lot," as well as from others at the Pratt house. He denied ever having sold drugs, observed drugs being sold from his or Carmen's homes, or observed Alfredo or Aaron doing drugs. He also denied ever having had an argument or fight with Lanell, carried a gun, or told Alfredo he was going to kill either of the Pratt twins. Andy testified that had never seen anyone other than blacks selling drugs on the street in the area of his parents' house.

Detective Alcaraz, who had patrolled the neighborhood where the shooting occurred frequently, testified that the drug trafficking in this area was conducted by African Americans; Alcaraz had never been aware of Hispanics selling drugs in this area. He had made more than 50 calls at the Pratts' house, and none at the Gonzales', prior to the shooting. Another police officer with experience in the drug trafficking culture of the neighborhood similarly testified that in 2005, it was predominantly run by African Americans and in particular the Pratt family. Hispanics were not involved in drug trafficking there and a Hispanic who tried to sell drugs on the street in that area would likely be shot.

Sheriff's Lieutenant Ed Barberini testified that he searched appellant's cell at the San Mateo County jail on August 1, 2006, as part of a routine random search for contraband and indications of safety problems. He identified exhibit No. 22 as a photocopy of a four-page handwritten note he found in appellant's cell, addressed to "Ken" and signed "Danell." The letter stated: "my P.I. came to see me and he was telling me that in the shooting case they *never* I.D. me they I.D. Nell.... *They never said in any of the report what I had*

5

*on.*  I had on my green army thermo dark blue jeans and black nikes on.  *Remember* this!  I told him I was at Raymond Michell house with they family because they was cooking for their brother dodee was over there.  I'm going to need you to go to Raymond house and tell him that they P.I. might stop by his house and tell him everything I'm telling you.  I was at his house around 8 to 830 pm and I stayed there intil 11 or 11:15 pm when you picked me up.  We went to Redwood City to get a drink (a fifth of yak) and we went back to your house and we chilled at your house, I said azaila.  I didn't want to say tammy's, but I stayed intil the next day.  If he ask you about Christmas ... with me intil nine or so and I drop him off at a one his friend's houses.  Make sure you go talk to Raymond and tell Raymond to tell his wife just in case but he knows already so it shouldn't be a problem but I don't want the P.I. going over there and he get caught off guard!  It's a trip how they picked Nell and got me."  Later, the letter states: "they can't charge Nell because they already charged me.  So that's double jeopardy and it's a done deal.... Raymond be home around ... so make sure you tell him or let him read this letter and tell him I was at his house at that time I didn't leave intil you came!  And what I was wearing that's it.  That's all and tell his wife the same thing.... Thanks, I owe you big time! ... Tell Nell the P.I. will call him soon.  Don't worry he is not go get in trouble.  I went to the law library yesterday and they can't charge him and they can't refile on either of us.  So tell him don't worry!"

Kennedy McGraw testified that he had known appellant for over 20 years and called him "Drew," but heard others refer to him as "Twin."  He identified exhibit No. 22 as a copy of a letter he received from appellant in August 2006.  After receiving this letter and having a telephone conversation in which appellant described some of the same details, McGraw told defense investigator Brian Vierra that he had been with appellant on the evening of December 24, 2005, and provided details consistent with what was described in the letter.[4]  In fact, McGraw testified, on the evening of December 24, he spent about two hours with appellant, beginning at about 7:30 p.m., and then did not see him again until the next morning.  When the police first came to talk with him, McGraw confirmed that he had told Vierra he was with appellant all night, then when confronted with the copy of the letter he had received, McGraw admitted he had lied.[5]  McGraw testified that he was trying to help his friend and that he had no idea where appellant was after he dropped appellant off on the evening of December 24, 2005.

Recordings of seven calls made from the county jail to Lanell's cell

---

[4] Defense investigator Brian Vierra testified that McGraw told him he had picked up appellant at 11:00 or 11:15 p.m. on December 24, 2005, drove him to a liquor store, and then to McGraw's home on Azalea, and socialized with appellant for the evening until he took appellant back home the next day.  Vierra knew that Lanell had an alibi.

[5] Detective Alcaraz testified that McGraw initially told him that the details in Vierra's report were accurate.  When Alcaraz told McGraw about the contents of the letter, McGraw gave a different statement that was consistent with his testimony at trial.

United States District Court
Northern District of California

6

phone in August and October 2006 were played for the jury. All the calls began with the announcement, "You are receiving a free call from an inmate at a correctional facility." The caller, "Drew," asked the recipient, often referred to as "Nell," to get Raymond Meacham's cell number for him and said, "I mean, Ken, if Ken don't do it, I just, I just, it's a backup plan know what I mean? I don't just want to be assed out cause my PI, because that's where I say I was headed the night it happened." The caller asked "Nell" to call the defense investigator, saying he "just want a character witness" and "they don't even know who did the shit ... they don't know us apart ... you got an alibi and they, they put it on me so it's double jeopardy they can't charge you with anything." In the next call, the caller told "Nell" not to call the investigator and said, "I gotta get my alibi though. That's the only thing. That's why I need someone to talk to Ray. [¶] ... [¶] ... just tell him what I said blood. Or call Ken and ask Ken what to do. Ken tell you. That's all you gotta do man. The obvious thing is just, I was there at like 8:30, like I was. That's it." The caller said, "You just stay out the way. Let me handle it."

Attorney Geoffrey Carr testified that he had represented Lanell "in cases involving his brother" for 15 years and could not tell the difference between them.

***Defense***
Appellant testified that he had known the Gonzalez family about 12 years and sold drugs to Andy in 1996 or 1997, but not since then. He testified that in his neighborhood, African Americans sold drugs at "street level" and Hispanics were the "middle man" distributors of "big packages," but there were some Hispanics who sold at street level. He denied that the Pratt family ran the drug trade in the neighborhood.

Appellant disclaimed ever having had any argument or dispute with Alfredo or Aaron. He remembered the incident Aaron described in which he made Aaron leave his grandmother's front yard, but testified that he just told Aaron to leave because Aaron was selling marijuana in front of their house. According to appellant, in the years preceding the shooting, Alfredo had been "getting big-headed ... getting a little money in the neighborhood, so he started acting like he was the man." About two weeks before the shooting, Alfredo came to the Pratt house and told appellant "he didn't want nobody getting killed over this, and if he didn't leave the neighborhood, he'd wind up with a bullet in the back of your head." Appellant told Alfredo he had gotten him confused with his brother because appellant did not sell drugs. Alfredo told him, "I know who you are. Just get out of the neighborhood." Appellant had seen Alfredo with a gun about a year before the shooting.

Appellant told Lanell about the conversation with Alfredo, and Lanell said, "The hell with Alfredo. I'm going to get that son of a bitch." Lanell said Andy had sold him some fake drugs and said he was going to "shoot the balls of Aaron" and kill both Alfredo and Aaron. Appellant told Lanell he did not want to have anything to do with this. In another conversation, Lanell told appellant, "I'm really going to get that Freddy. You better get your alibi together because

7

my wife's family is going to provide an alibi for me, and it's going to be Christmas at midnight, so you better get your alibi set for that time."

Appellant testified that at around midnight on December 25, 2005, he was at his grandmother's house, where he had been since 10:15 p.m., when his friend Ken McGraw dropped him off.  He went to his grandmother's because she said she was lonely and wanted him to spend Christmas with her, and Lanell also wanted him to spend time with her.  Lanell was not there when appellant arrived, but came in around 11:15 p.m. and then left again about 11:30 p.m.  Lanell was wearing dark clothing and, as he left, he put on a hoodie, leaving the hood hanging on the back.  He was not gone long and when he returned the hoodie was pulled over his head and tied tight, so that appellant could see only his eyes and nose, not enough of his face to tell who he was.  Lanell then left again, hurriedly, saying, "'if the police come looking for me, I'm not here.'"

Appellant heard sirens and looked out the front door to see police cars, woke his grandmother, went outside and asked a neighbor standing next door what had happened.  She told him she thought the "two younger brothers" got killed.  Appellant thought the neighbor meant Alfredo and Aaron and thought, "Whoa.  Maybe my brother had something to do with this."  Appellant returned to his grandmother's house, left through the back door, and drove to San Jose.  He testified that he did not know whether his brother had anything to do with what happened and he "didn't want to be accused of it."  As he was driving, he called his brother, said someone had been shot at Andy's house, and asked if Lanell had anything to do with it.  Lanell said he knew and "I'm just telling you now just to get an alibi.... I'm on my way to my alibi and you better get one because mine is airtight."

A couple of days later, Lanell called and told appellant, "you better get your alibi together."  About the shooting, Lanell said Andy had "ripped him off for some drugs" and he was "getting him back."  Lanell told appellant six or seven times to get an alibi, but appellant did not take him seriously until appellant was arrested.  He wrote the letter to Ken that was found in his cell in order to create an alibi for himself because he was being charged with something he did not do.  In addition to Lanell, the defense investigator told appellant he needed to "work on your alibi," and appellant's lawyer also talked to him about an alibi.  Appellant's lawyer told him that Lanell had an alibi and that this "affected me deeply because if my brother had an alibi, then most likely they would put the focus on me."  Appellant testified that in the recorded calls from jail to Lanell, he was trying to set up an alibi for himself, but Lanell did not help him.  Lanell told appellant he would "come and take care of this for me if it got too heavy for me," but he had not done so.

Appellant did not know where Lanell was at the time of trial and testified that he had been unsuccessfully trying to reach him.  On cross-examination, he denied wanting Lanell to stay away so the jury would not be able to see that they were in fact distinguishable in person.  Although he was aware that Lanell had moved to Alabama with his wife and her parents, appellant had not tried to find their

number through a directory. He claimed to have asked his mother to contact Lanell and get him to come to court to take responsibility for the case, but appellant did not ask her where Lanell was, try to contact Lanell's wife, or ask the defense investigator to try to find Lanell. He acknowledged that he never told the defense investigator there was a potential issue between Lanell and the victims.

Appellant testified that while the physical lineup was being prepared, he told the officer in charge, Sergeant Schofield, that everyone should be wearing black hoodies and Schofield said, "if you tell me that again, you'll be going to the hole." He said he asked for the lineup participants to wear hoodies because the preliminary hearing indicated the victims claimed to have seen someone in a black hoodie, but he acknowledged that the victims did not refer to the hoodie covering the shooter's face. Sergeant Schofield denied threatening appellant and did not recall appellant asking for the participants to wear black hooded sweatshirts.[6]

Appellant acknowledged on cross-examination that he had been convicted in June 2007 of rape of an intoxicated minor, in 1999 of discharging a firearm in a grossly negligent manner that could result in injury or death of a person, and in 1993 of misdemeanor assault against a police officer. He was aware that Lanell had been arrested for drugs several times, but otherwise disclaimed awareness of Lanell's criminal history when asked about Lanell having been convicted of resisting arrest in 2003, inflicting injury on a child in 1997, battery with serious bodily injury in 1996, and possession of crack cocaine in 1993.

Appellant testified that he was "sometimes" known as "Twin," and that in the family, he was known as "Drew" and Lanell was known as "Nell." Only the family and a few very close friends called appellant Drew; the Gutierrez and Gonzalez family did not. In December 2005, he wore his hair "bald," meaning cut to the skin, as depicted in a photograph taken in May 2006, five months after the shooting. Alcaraz subsequently testified that in a photograph of appellant taken on June 22, 2005, six months before the shooting, by other officers in connection with a different case, appellant was not bald but rather had hair on the top of his head.

*People v. Pratt*, No. A124125, 2011 WL 4442833, at *1-9 (Cal. Ct. App. Sept. 26, 2011).

## II.   PROCEDURAL HISTORY

On December 12, 2008, a jury found Petitioner guilty on two counts of attempted murder, making a special finding as to each count that Petitioner had personally and intentionally discharged a firearm and proximately caused great bodily injury to the victim. *Pratt*, 2011 WL

---

[6] Schofield described the procedures he followed in arranging lineups, including having the defendant pick the participants and ensuring the participants were dressed alike and did not display identifying marks that would distinguish between them.

United States District Court
Northern District of California

1    4442833 at *1.  On February 13, 2009, Petitioner's motions for a new trial and to dismiss a prior

2    strike conviction were denied.  *Id.*  He was sentenced to 78 years to life in prison.  *Id.*  He filed a

3    direct appeal on February 24, 2009, arguing that the trial court erred in admitting evidence of jail

4    phone calls.  (Ex. F at 1.)  The appeal was denied on September 26, 2011.  *Id.*  His petition for

5    review to the California Supreme Court was likewise denied on January 4, 2012.  (Ex. H.)

6         On March 6, 2013, Petitioner filed a Petition for Writ of Habeas Corpus in the state trial

7    court, asserting claims for ineffective assistance of counsel and denial of counsel.  (Ex. I at 3-10.)

8    On March 19, 2013, Petitioner filed his Petition in this Court prior to exhausting his state court

9    remedies.  (Dkt. No. 1.)  The Court stayed the action pending exhaustion of the state process.

10   (Dkt. No. 7.)  The state trial court denied his petition on July 31, 2013.  (Ex. J.)  On November 13,

11   2013, the California Supreme Court denied his petition "on the merits."  (Ex. L.)  On February 10,

12   2014, Petitioner filed an amended petition in this Court.

13   **III.    APPLICABLE STANDARDS OF REVIEW**

14        **A.    Legal Framework**

15        A federal court may entertain a habeas petition from a state prisoner "only on the ground

16   that he is in custody in violation of the Constitution or laws or treaties of the United States."  28

17   U.S.C. § 2254(a); *see also Rose v. Hodges*, 423 U.S. 19, 21 (1975).  Under the Antiterrorism and

18   Effective Death Penalty Act ("AEDPA"), a district court may not grant a petition challenging a

19   state conviction or sentence on the basis of a claim that was reviewed on the merits in state court

20   unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to,

21   or involved an unreasonable application of, clearly established Federal law, as determined by the

22   Supreme Court of the United States; or (2) resulted in a decision that was based on an

23   unreasonable determination of the facts in light of the evidence presented in the State court

24   proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed

25   questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000), while the second

26   prong applies to decisions based on factual determinations, *Miller–El v. Cockrell*, 537 U.S. 322,

27   340 (2003).

28        A state court decision is "contrary to" clearly established Supreme Court precedent if it

United States District Court
Northern District of California

10

"applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405-6. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The state court's decision is reviewed for conformity with Supreme Court precedents that existed at the time of that decision. *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011). Section 2254(d)(1) requires federal courts to "focu[s] on what a state court knew and did," and to measure state-court decisions "against this Court's precedents *as of 'the time the state court renders its decision.'*" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) (emphasis supplied) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003)).

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340. Where constitutional error is found, habeas relief is warranted only if the error at issue had a "'substantial and injurious effect' on the verdict." *Penry v. Johnson*, 532 U.S. 782, 796 (2001).

In determining whether the state court's decision is contrary to or involved an unreasonable application of clearly established federal law, or is based on an unreasonable determination of the facts, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claims in a reasoned decision. *See Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

A district court may review a state court's determination de novo where the court failed to adjudicate a petitioner's claim on the merits. *See Johnson v. Williams*, 133 S. Ct. 1088, 1097

United States District Court
Northern District of California

1   (2013) ("The language of 28 U.S.C. § 2254(d) makes it clear that this provision applies only when

2   a federal claim was 'adjudicated *on the merits* in State court.'").  "When a federal claim has been

3   presented to a state court and the state court has denied relief, it may be presumed that the state

4   court adjudicated the claim on the merits in the absence of any indication or state-law procedural

5   principles to the contrary."  *Harrington v. Richter*, 562 U.S. 86, 99 (2011) (noting, however, that

6   this presumption may be overcome where "there is reason to think some other explanation for the

7   state court's decision is more likely").  Moreover, "[w]here there has been one reasoned state

8   judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting

9   the same claim rest upon the same ground."  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

10   **B.   Analysis**

11        Petitioner now asserts five grounds for relief: (1) violation of his Sixth Amendment right to

12   confront witnesses (based on the admission of jailhouse recordings); (2) ineffective assistance of

13   counsel ("IAC") based on counsel's presentation of a purportedly fabricated narrative during his

14   opening statement and his coercion of Petitioner to testify in accordance therewith; (3) IAC based

15   on counsel's alleged failure to impeach prosecution witnesses by calling Petitioner's family

16   members as witnesses; (4) IAC based on counsel's failure to discover and present certain third-

17   party culpability evidence; and (5) complete denial of counsel based on counsel's "apparent

18   dementia, impaired judgment, failure to investigate, and dishonesty."  (Dkt. No. 31.)  The

19   government concedes Petitioner has exhausted his remedies as to each in state court.  (Dkt. No. 24

20   at 2.)  Specifically, the first ground was exhausted on direct appeal, the others through his state

21   petition for a writ of habeas corpus.

22        The parties do not dispute that the state court addressed issues 1-3 on the merits.  Petitioner

23   argues, however, that issues 4 and 5 were not addressed on the merits in state court and thus now

24   warrant de novo review.  The California Supreme Court decision stated only that "[t]he petition

25   for writ of habeas corpus is denied on the merits," followed by a citation to *Harrington* noting that

26   adjudication on the merits is presumed even where an opinion fails to specifically address a claim.

27   (Exh. L.)  Thus, the Court considers the trial court's July 31, 2013 reasoned decision (Ex. J)

28   denying the petition.  *See Ylst*, 501 U.S. at 803.

United States District Court
Northern District of California

The state court petition included issues 2 and 3 on the state form itself, while issues 4 and 5 were included as an attachment thereto.  (Ex. I.)  The state court's ruling specifically addressed only IAC claims reflected in issues 2 and 3, making no specific mention of issue 4 (IAC based on counsel's failure to present certain third-party culpability evidence) or issue 5 (the claim for complete denial of counsel pursuant to *Cronic*).  *See United States v. Cronic*, 466 U.S. 648, 659 (1984) (noting no specific showing of prejudice is required "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," because such circumstances constitute "a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable").  These circumstances provide sufficient reason to believe that it is more likely than not that the state court simply overlooked the attachment in ruling on the petition, and thus its silence as to grounds for relief included in the attachment—but not in the form itself—did not constitute adjudication on the merits as to those issues.

Notably, however, the entire basis for issue 4 was included on the form within the section addressing issue 3.  (Ex. I at 4.)  As both issues 3 and 4 are IAC claims, the state court may have simply chosen to address what it deemed to be the stronger of the multiple ineffective assistance arguments contained within those paragraphs on the form—namely, those described by the heading supplied.  The circumstances thus do not warrant an inference that the state court failed to adjudicate issue 4 on the merits.  *See Harris v. Superior Court of State of Cal., Los Angeles Cty.*, 500 F.2d 1124, 1128 (9th Cir. 1974) (a "postcard denial without opinion" constitutes adjudication on the merits absent circumstances indicating otherwise).  As a result, only issue 5 is subject to de novo review by this Court.

## IV.   DISCUSSION

### A.   Jailhouse Recordings

Before the trial court and on direct appeal, Petitioner argued jailhouse recordings introduced as evidence at trial were inadmissible hearsay.  Petitioner now renews this argument.  The state Court of Appeal recounted the relevant circumstances:

> Appellant contends the queue report and recorded calls he made from jail to Lanell were inadmissible hearsay and their admission violated his constitutional rights to confrontation and due process.

Prior to trial, the prosecution filed a motion to admit appellant's statements contained in the recorded calls as well as in the letter to "Ken." The prosecution urged that appellant's statements tended to show that he, rather than Lanell, committed the shootings, and that appellant was seeking assistance in creating an alibi. Defense counsel argued that the material violated appellant's rights to privacy and to prepare for trial, and that jail phone calls relating to an inmate's case are privileged as attorney-client communications and work product. The prosecutor countered that recording jail telephone conversations is not a violation of privacy as long as there is notice the calls would be recorded, and that none of the proffered calls were to appellant's attorney or other agent of the defense.

The court granted the motion to admit the evidence, specifically overruling defense objections based on attorney-client or work-product privilege, and on relevance "to the extent that ... objection was made by the defense and not just raised by the court...." The court rejected defense counsel's argument that the letter found in appellant's cell during a search for contraband, which did not indicate it was intended for appellant's attorney or other defense agent, should not have been seized.

During trial, the prosecution called Hussein Nava, the site administrator for Global Testings Phone System, who maintained the inmate telephones and telephone system at the Maguire Correctional Facility and the recordings of calls made from the jail. Nava testified that as soon as an inmate picked up a telephone, the "cam system" would begin recording; the recorded calls could be searched in various ways, including by phone number, called by holding cell or housing unit, or by particular phone used. A placard on the jail telephones states that calls are monitored and recorded, and during a call the inmate would hear a computer generated voice saying the call is being monitored and recorded. A law enforcement request for recorded calls would go first to the sheriff's office, then, if approved, to Nava. Nava would enter the information requested, such as the dates and phone number called, into an application that would bring up the results, then use the same application to transfer the requested calls onto a CD. In addition to the calls themselves, the CD would contain a text file called a "queue report."

Nava identified exhibit No. 32A as the queue report generated with the recorded call for this case. He testified that the CD containing the calls and queue report, exhibit No. 32, was prepared by Tom East, Nava's predecessor in the job at the prison. Nava had access to all of East's records for the phone system.

When the prosecutor began to question Nava about the information to be gleaned from the queue report, defense counsel objected that an adequate foundation had not been laid. The court found Nava had sufficient expertise to discuss the contents of the queue report because he took the place of the person who did the job when the report was generated. Nava testified that the queue report showed the location in the jail from which a call was made, the number being called, and the date, time and duration of the call. Nava knew that the queue report was associated with exhibit No. 32 because he had looked at the CD on a computer and saw that it matched the

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

queue report.  This was how he would normally handle requests for material from prior to his taking over the job from East.

On voir dire, Nava testified that he was not present when the recordings and paperwork under discussion were made.  He did not have personal knowledge about the making of the tapes, but was trained to generate such reports and call records.  Upon defense counsel's further foundation objection, the prosecutor elicited Nava's testimony that the records from the telephone calls at the jail were kept and maintained in the regular course of business, he had access to these records as the person responsible for maintaining and retrieving the calls, and he relied on the records to be reliable.  The queue report appeared to be a document generated in the regular course of the business; it looked "the way that the system generates them" and "unaltered."  The CD also appeared as the records were normally kept and maintained in the regular course of business.

Defense counsel at this point asked Nava if he knew from personal knowledge where the CD and queue report had been kept for the last couple of years and Nava said he did not.  The prosecutor asserted that the business record exception to the hearsay rule had been established.  Over defense counsel's objection that Nava was not the custodian of records, the court ruled that Nava qualified as custodian of records but suggested the prosecutor lay "a little more foundation with regard to authenticity" of the particular CD and queue report.
Nava then testified that, at the prosecutor's officer earlier that day, in the normal way he would view retrieved records from the security phone system, he put exhibit No. 32 into a computer and saw that the contents matched the queue report.  The documents reflected phone calls from the county jail to phone number (408) 903–8972 between June 3 and October 5, 2006.  Nava testified that the documents were generated in response to a request from law enforcement, received on November 2, 2006, for calls to that phone number.  Because the phone system does not identify the person making a call, Nava could not do more than testify that the tape accurately reflected the numbers on the queue report.  The CD had been given to the prosecutor by East and Nava first saw it, as well as the queue report, in the prosecutor's office on the day he was testifying.   Over defense counsel's objection, the court held a sufficient foundation had been laid for the business records exception to the hearsay rule.

Detective Jerry Alcaraz authenticated the transcript of the recorded jail calls (exh. No. 32B), the calls were played for the jury, and exhibit Nos. 32A and 32B were introduced into evidence.

*Pratt*, 2011 WL 4442833, at *9-11.

In reviewing these circumstances, the appellate court agreed with the trial court that no Sixth Amendment violation occurred because the recordings were admissible under the business records exception to the hearsay rule.  *Id*. at *11.  The appellate court rejected Petitioner's argument that a custodian of records needs personal knowledge of the "generation, preparation and

15

1    production of the records" at issue, noting the purpose of the rule is to eliminate the necessity of

2    calling numerous persons involved in the process.  *Id*. at *12.  The court also rejected Petitioner's

3    argument, under *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 320 (2009), that the rule did not

4    apply because the business activity at issue was "the production of evidence for use at trial."  *Id*. at

5    *12-13.  Here, the activity in question was recording of inmate calls for prison administrative and

6    security purposes, not solely purposes of litigation.  *Id*.  In the alternative, the appellate court

7    found that any error in admitting this evidence was harmless, as similar evidence of Petitioner's

8    attempt to create an alibi was already in the record in the form of his jailhouse letter.  *Id*. at *14.

9          Petitioner again argues the business records exception should not apply in light of

10   *Melendez-Diaz*.  He contends the recordings were primarily made for litigation purposes and

11   asserts that the queue report and CD were prepared specifically for litigation, such that the

12   individual responsible for their preparation should have been subject to cross-examination.  The

13   Court does not agree that such an extension of *Melendez-Diaz* is warranted, nor does the Court

14   find any unreasonable application of clearly established Supreme Court precedent or unreasonable

15   determination of facts in light of the evidence by the appellate court.  Thus, the Petition on this

16   ground is DENIED in light of AEDPA's deferential standard of review.

17        **B.    Ineffective Assistance of Counsel**

18        As noted above, Petitioner raises three claims of IAC.  Claims of ineffective assistance of

19   counsel are examined under *Strickland v. Washington*, 466 U.S. 668 (1984).

20        To prevail on a claim for ineffectiveness of counsel, a petitioner must establish two factors.

21   First, he must establish that counsel's performance was deficient, *i.e.*, that it fell below an

22   "objective standard of reasonableness" under prevailing professional norms, *id.*at 687-88, "not

23   whether it deviated from best practices or most common custom,"  *Harrington v. Richter*, 562

24   U.S. 86, 105 (2011) (citing *Strickland*, 466 U.S. at 690).  "A court considering a claim of

25   ineffective assistance must apply a 'strong presumption' that counsel's representation was within

26   the 'wide range' of reasonable professional assistance."  *Id*. at 104 (quoting *Strickland*, 466 U.S. at

27   689).  Second, he must establish that he was prejudiced by counsel's deficient performance, or that

28   "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

United States District Court
Northern District of California

proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. Where the petitioner is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).

### 1.    Opening Statement

Petitioner's strongest allegation is the assertion by him and his wife (Dkt. No. 33 at 10-12, 17-19) that trial counsel, LeRue Grim, fabricated an implausible defense theory, presented it during oral argument, and then coerced Petitioner to testify in conformance therewith. He bolsters his allegation by pointing to trial counsel's subsequent disbarment, wherein the State Bar Court found he had demonstrated a "disturbing willingness to employ deceitful means to accomplish his objectives." (Exh. D at 10, 12.) However, a review of the evidence introduced at Petitioner's trial and summarized above in the state Court of Appeal decision undermines the allegation and suggests that Petitioner himself sought to fabricate an alibi before trial. Further, and by contrast, Grim submitted a declaration wherein he stated that he "got the information" for his opening statement during 40 or 50 meetings with Petitioner, but he did not clearly and directly refute the claim. (Dkt. No. 33 at 22-23.)

Petitioner argues he was entitled to a hearing in state court to address this "credibility" dispute between Petitioner and his former lawyer. *See Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012) ("[W]e have held that a state court's resolution of a 'credibility contest' between a petitioner and law enforcement officers [without an evidentiary hearing] was an unreasonable determination of fact where the evidence in the record was consistent with the petitioner's allegations.") (citing *Earp v. Ornoski*, 431 F.3d 1158, 1169-70 & n.8 (9th Cir. 2005)). However, "a state court [need not] conduct an evidentiary hearing to resolve every disputed factual question," and no such hearing is required where the record precludes habeas relief. *See Hibbler v. Benedetti*, 693 F.3d 1140, 1147-48 (9th Cir. 2012). Thus, if the record supported a finding of lack of prejudice, the absence of an evidentiary hearing would not be problematic. Petitioner

1    contends the state court incorrectly found a lack of prejudice resulting from the purported coerced

2    testimony, noting that it was: (1) not believable, and (2) "opened the door to prejudicial evidence

3    that the Pratt family was involved in selling drugs and other crimes," including Petitioner's prior

4    rape conviction.  (Dkt. No. 31 at 39-40; *see also* 10 RT 911.)  However, the state court could have

5    reasonably determined that other evidence in the record—including eyewitness identification of

6    Petitioner by victims who had known him since they were young children, evidence pointing to

7    Petitioner's attempts to fabricate an alibi, and Petitioner's acknowledgement that he "did not have

8    a good alibi"—was so substantial as to render the admission of this additional evidence harmless.

9    (Ex. K at 152.)  Again, under AEDPA's deferential standard, the Court finds neither an

10   unreasonable application of clearly established Supreme Court precedent nor an unreasonable

11   determination of facts by the state court in reaching its conclusion.  The Petition on this ground is

12   therefore **DENIED**.

### 2.    Failure to Call Family Members

14          Petitioner submits declarations from various family members suggesting they would have

15   testified as to their inability to tell Petitioner apart from his twin brother and that Petitioner was the

16   friendly twin, his brother the mean twin.  Such testimony, of course, would have served to

17   undercut testimony by the prosecution witnesses summarized above regarding their identification

18   of Petitioner as the perpetrator, including testimony that Petitioner was the "meaner" twin.  Such

19   testimony, however, also would have readily been subject to impeachment for bias, coming from

20   Petitioner's family members.  Moreover, as noted above, there was already testimony in the record

21   from Geoffrey Carr, who had known Petitioner for years "in cases involving his brother," that Carr

22   could not tell them apart from one another.  Additional testimony to that effect from potentially

23   biased sources would have been cumulative and so trial counsel may have made a strategic

24   determination not to seek it out or present it for that reason, or perhaps because it could have

25   opened other doors to information more prejudicial to Petitioner.  Thus, the state court's finding

26   that Petitioner failed "to show a reasonable probability that the testimony of his family members

27   would have dissuaded the jury from believing eyewitness testimony identifying him as the

28   perpetrator" must be credited under AEDPA's deferential standard of review.  (*See* Ex. J at 2.)

United States District Court
Northern District of California

18

1    Consequently, the Petition on this ground is **DENIED**.

2           **3.**      **Failure to Present Third-Party Culpability Evidence**

3          Petitioner argues his trial counsel failed to investigate and present additional evidence

4    pointing to his twin as the shooter.  A police officer had reported that witness Andres Gonzalez

5    had told the officer that the twin he saw near the scene shortly before the shooting said he was on

6    parole.  However, introducing these circumstances might have pointed to Petitioner's guilt, rather

7    than his innocence: being spotted by a family member of his intended victim shortly before

8    commencing with an intended assault, Petitioner may have intentional made a misstatement in an

9    attempt to create future reasonable doubt as to his identity.[7]  Moreover, because the evidence is of

10   so little probative value, it is unlikely to have singlehandedly swayed the jury's verdict.  While the

11   state court did not specifically address this issue, as noted above, the Court finds no unreasonable

12   application of clearly established Supreme Court precedent or unreasonable determination of facts

13   by the state court in denying the claim for ineffective assistance of counsel on this ground without

14   explanation of its reasoning.  *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) (noting

15   an independent review is necessary in the face of an unreasoned state court decision to determine

16   whether the decision was objectively unreasonable).  On the present record, the Court would reach

17   the same conclusion even under de novo review.  Therefore, the Petition on this ground is also

18   **DENIED**.

19         **C.**      **Complete Denial of Counsel**

20         Finally, the Court reviews, de novo, Petitioner's claim that he suffered a complete denial of

21   his right to counsel as a result of his trial attorney's "apparent dementia, impaired judgment,

22   failure to investigate, and dishonesty."  (Dkt. No. 31 at 47.)  In the event that "counsel entirely

23   fails to subject the prosecution's case to meaningful adversarial testing, then there has been a

24   denial of Sixth Amendment rights that makes the adversary process itself presumptively

25   _____

26         [7] Petitioner argues such conduct would be inconsistent with his failure to establish an alibi before the shooting or "wear some identifiable article of Lanell's clothing."  (Dkt. No. 31 at 45-

27   46.)  The jury could have found that Petitioner failed to perfectly plan for all contingencies while still attempting to cast doubt as to his identity when spotted in the moments leading up to the

28   shooting.

         United States District Court
         Northern District of California

1    unreliable." *See Cronic*, 466 U.S. at 659 (noting the presumption would also arise if the defendant

2    was "denied counsel at a critical stage" of the trial).  In such circumstances, unlike in the

3    traditional ineffective assistance case, "[n]o specific showing of prejudice" is required.  *Id.*

4         Petitioner identifies a number of circumstances as, together, constituting a complete denial

5    of his right to counsel.  First, Grim was 79 years old at the time of the trial.  Second, he had a long

6    history of State Bar discipline and was disbarred in 2012.  Third, as addressed above, Grim

7    purportedly made a false opening statement and coerced Petitioner into testifying in conformance

8    therewith.  Fourth, Grim also purportedly encouraged Petitioner's wife to testify falsely.  Fifth,

9    Grim failed to present the additional potential evidence addressed above.  Sixth, Grim was

10   "subject of ridicule and derision" at trial by the judge and prosecutor, with "everyone laughing at

11   his ineptness" and, at one point, the judge inquiring as to his sobriety due to his "contemptuous"

12   behavior.  (Dkt. No. 15 at 18-19.)  Finally, according to appellate counsel, Grim "seemed

13   determined to defend himself dishonestly" after the trial.[8]

14        As to the first, second, and final issue, respectively, the Court finds that counsel's age,

15   subsequent disbarment for unrelated matters, and post-trial conduct while no longer representing

16   Petitioner do not in and of themselves establish denial of counsel at a "critical stage" of trial

17   rendering "the adversary process itself presumptively unreliable" or otherwise constitute a per se

18   denial of Petitioner's Sixth Amendment rights.  *See, e.g.*, *United States v. Mouzin*, 785 F.2d 682,

19   698 (9th Cir. 1986) ("Neither suspension nor disbarment invites a per se rule that continued

20   representation in an ongoing trial is constitutionally ineffective.").  Petitioner's complaints

21   regarding the opening statement and counsel's failure to introduce certain other evidence were

22   addressed by the trial court, as noted above, and appropriately denied under the rubric of

23   ineffective assistance of counsel.  None of those circumstances, or the claim regarding Petitioner's

24

25        [8] In his Traverse, Petitioner points to additional issues not included in the Amended
26   Petition, such as Grim's contemporaneous preoccupation with a higher-profile case, his purported
     office disorganization, and "bizarre and grossly inappropriate" claims on his former website.
27   None of these issues, however, rise to the level of a constructive complete denial of the right to
     counsel.  (Dkt. No. 31 at 48.)  Claims that Grim "acted like he had dementia" during the trial by
28   Petitioner and his family members are not borne out by the record.  (*Id.* at 49.)

United States District Court
Northern District of California

United States District Court
Northern District of California

wife, rises to the level of a complete failure to subject the prosecutor's case to adversarial testing, such as where a lawyer falls asleep during the government's cross-examination of his client, informs the jury that his client committed the offense beyond a reasonable doubt, or the like.  *See, e.g.*, *Javor v. United States*, 724 F.2d 831, 833 (9th Cir. 1984) (holding that "when an attorney for a criminal defendant sleeps through a substantial portion of the trial, such conduct is inherently prejudicial and thus no separate showing of prejudice is necessary"); *United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir. 1991) ("A lawyer who informs the jury that it is his view of the evidence that there is no reasonable doubt regarding the only factual issues that are in dispute has utterly failed to 'subject the prosecution's case to meaningful adversarial testing.'"); *Frazer v. United States*, 18 F.3d 778, 780 (9th Cir. 1994) (finding presumptive Sixth Amendment violation where counsel purportedly used derogatory language to refer to his client and expressed a hope that his client would receive a life sentence).  To the contrary, the record reflects a trial attorney who was perhaps not particularly skillful but who nevertheless successfully made and argued against objections (*see, e.g.*, 10 RT 869-70, 913, 934), adequately cross-examined government witnesses (*see, e.g.*, 6 RT 438-49, 10 RT 837-38), presented a logical defense to the jury in light of the evidence, and advocated on Petitioner's behalf during a jury instruction conference (11 RT 1028) and at sentencing (14 RT 1271-73).

The final issue—that counsel was purportedly ridiculed throughout trial and perhaps inebriated and therefore essentially absent—appears to take the record out of context.  After a particularly heated examination of the Petitioner himself both on direct and cross-examination, the judge, apparently frustrated with the gestures and demeanor of both counsel, admonished them thus:

> THE COURT: We're back on the record outside the presence of the jury.  And, Mr. Grim, I do want to make sure that you're not under the influence of anything.  There were two contemptuous remarks made or gestures, and I don't appreciate them.  And I want to make sure that you are aware of the fact that you're doing this.  Are you, sir?
>
> MR. GRIM: Would you rephrase that last question, please?
>
> THE COURT: The hallelujah gesture when I overruled an objection was contemptuous. The comment earlier –

1

2      MR. GRIM: I apologize.

3      THE COURT: The comment earlier that the question sounded argumentative to you when I overruled was contemptuous.

4      MR. GRIM: I apologize.

5      THE COURT: Do I have to say any more to keep you from acting in such a fashion for the rest of this trial?

6      MR. GRIM: No.

7      THE COURT: And, Ms. McKowan, your exasperation that you made very evident to the jury after I overruled your leading objection was not appreciated.

8

9      MS. McKOWAN: I apologize.

10  (10 RT 1020-21.)  The court took both counsel to task for expressing "exasperation" when their

11  objections were overruled.  There is no indication that Mr. Grim was, in fact, "under the influence

12  of anything" during trial.  The totality of the record belies the claims that Grim stumbled over

13  words, tripped over furniture (resulting in laughter by other trial participants and spectators),

14  arrived late to court, and the like, as claimed by Petitioner and his family members.

15      Thus, the Petition on this ground is likewise **DENIED**.

16  **V.    CONCLUSION**

17      For the reasons stated above, the Court finds Petitioner is not entitled to federal habeas

18  relief.  Petitioner's request for a Certificate of Appealability is **DENIED**.  *See Slack v. McDaniel*,

19  529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the Ninth Circuit

20  Court of Appeals.  The Clerk shall enter judgment in favor of respondent, terminate any pending

21  motions, and close the file.

22      **IT IS SO ORDERED.**

23  Dated: March 2, 2016

24

25      _____
      **YVONNE GONZALEZ ROGERS**
      **UNITED STATES DISTRICT COURT JUDGE**

26

27

28

United States District Court
Northern District of California